# United States Court of Appeals
## For the First Circuit

No. 12-2293

UNITED STATES,

Appellee,

v.

ROYCE BRETON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Torruella, Dyk,* and Thompson, Circuit Judges.

Timothy E. Zerillo, with whom Amy T. Robidas and Zerillo Law,
LLC, were on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with
whom Thomas E. Delahanty II, United States Attorney, was on brief,
for appellee.

January 6, 2014

_____

* Of the Federal Circuit, sitting by designation.

**THOMPSON, Circuit Judge.**  On May 10, 2012, a jury in the District of Maine convicted Royce Breton of producing, possessing, and distributing child pornography.  The district judge subsequently sentenced Breton to 340 months of imprisonment, followed by fifteen years of supervised release.  Breton now appeals, challenging the admission of certain evidence, the sufficiency of the evidence as to all charges, and the calculation of his sentence.  Finding none of his claims persuasive, we affirm both his conviction and his sentence.

## I. Facts and Background

Because Breton contests the sufficiency of the evidence, we present the facts in the light most favorable to the verdict. See United States v. Stefanik, 674 F.3d 71, 73 (1st Cir. 2012).

## A. The Investigation

The unusual trail leading up to this case began on August 16, 2010, when Lewiston Police Officer David Brule, State Police Sergeant Glenn Lang, and State Trooper David Armstrong made an unannounced visit to Breton's house in Sanford, Maine to investigate an unrelated computer hacking crime.[1]  Breton, a nuclear electronics supervisor at the Portsmouth Naval Shipyard and part-time pre-medical student at the University of New England,

---

[1] The district judge excluded further information about the nature of this alleged crime from trial, so we do not dwell on it here.

shared the home with his then-wife, Amanda Paradis, and their young daughter.

The officers arrived at about 1:00 p.m., while Paradis was at work and Breton, who worked the evening shift, was home alone. When Breton answered the door, the officers asked if they could come in to speak with him about the computer hacking crime. Before they entered, Trooper Armstrong saw a sizable dog in the house and asked Breton to secure it in another room. Breton complied, but he also took advantage of the opportunity to hide the Sony laptop computer (the "laptop") that he and Paradis shared in the basement.[2]

A few moments later, Breton let the officers in and responded courteously to their questions. He led them upstairs to his custom-built desktop computer (the "desktop") and an old, non-functioning Gateway laptop computer (the "Gateway"). When asked whether he had used wiping software on those computers, Breton replied he had not and permitted the officers to take them for further inspection.[3] Breton made no mention of another computer squirreled away in the basement.

When Paradis arrived home that evening, Breton told her about the officers' visit and their computer hacking investigation.

_____

[2] The laptop had been a Christmas gift from Breton to Paradis, but both Breton and Paradis used it.

[3] Wiping software is used to overwrite data in order to prevent its recovery.

He said the police had taken the desktop and the Gateway, but they had not taken the laptop because he had put it in the basement. Breton explained to her that "he didn't think [the officers] needed to have [the laptop]," because "[h]e told them everything that they needed to know."

As a result of this conversation, Paradis decided to take the couple's daughter and move in with her parents. She also took the laptop, telling Breton she was worried the police would come back to their house and blame her for concealing it. On August 26, 2010, ten days after the officers' visit and unbeknownst to Breton, Paradis contacted the police and arranged for Officer Brule to retrieve the laptop at her workplace.

About a week later, Breton asked Paradis about the laptop. When she said she had given it to the police, Breton became very distraught, saying she had "screwed everything up" and "he was going to go to jail and lose his job." Later, in a heated text message exchange, Breton again expressed anger at Paradis for turning in the laptop and told her he "should have sh[o]t [her] instead."[4]

---

[4] Text records reveal that Breton said this after Paradis said Breton was a "wackjob" who had "been talking about killing himself and shooting cops." Breton replied, "I guess I should have sh[o]t you instead." The jury did not hear the full conversation, but both Paradis and Breton testified that Breton said he should have shot Paradis.

On September 8, 2010, Breton called Officer Brule to ask when his computers would be returned. They agreed to meet and discuss the matter on September 20.

In the meantime, Officer Brule examined the laptop and, in doing so, uncovered sexually explicit images of children in a hidden file associated with Yahoo Messenger — a chat program that allows users connected over the internet to converse and exchange files, including images or videos — and the username "Shadowwind345." Officer Brule also discovered that wiping software had been installed on the laptop on August 16, 2010 at roughly 2:00 p.m. — i.e., shortly after the officers had left Breton's house.

At their September 20 meeting, when Officer Brule asked Breton why he had not turned over the laptop, Breton answered that it belonged to his wife and contained intimate images of the couple that he did not want others to see. He admitted to installing the wiping software on the laptop but claimed he used it only to remove the private images of him and his wife. He conceded that this might make it look like he was destroying evidence, but he insisted that he knew nothing about the Shadowwind345 account and said he was "completely flabbergasted" when Officer Brule told him about the child pornography images found on the computer.

Yahoo later informed Officer Brule that the Shadowwind345 account was created on June 23, 2001 and was registered to an

-5-

obviously-fictional "Mr. Nonesuch-ever-was" in Cleveland, Ohio. Although Breton never admitted to creating the account, at trial Breton acknowledged that he often used the combination "345" in his usernames and passwords. For example, his e-mail address was Breton345@metrocast.net. He also conceded at trial that his dad used to have a cat named Shadow. The Shadowwind345 account was deactivated on September 18, 2010 — two days before Breton's appointment with Officer Brule — from an IP address registered to MetroCast (Breton's internet provider) at Breton's home, and associated with Breton's e-mail address.[5] An in-depth investigation followed.

### 1. The Laptop

Officer Brule and Secret Service Special Agent Matt Fasulo, a computer forensics expert attached to the Maine State Police Computer Crimes Unit, recovered roughly three hundred images of child pornography from the laptop in hidden folders related to the Yahoo Messenger program.[6] Two hundred of these images were identified as portraying known child victims in the National Center for Missing and Exploited Children database.

---

[5] An IP address is a series of numbers that identifies computer information over a network.

[6] At trial, the parties stipulated that these images "contain[ed] visual depictions of actual minors engaging in sexually explicit conduct as those terms are used in 18 U.S.C. § 2256," and had been transported in interstate or foreign commerce.

Of the unidentified images, three were singled out as photographs of a young female child, dubbed "Minor A." Each depicts a close-up of Minor A's genitals. In the photographs, Minor A has a crease in her right thigh, is lying on a patterned quilt, and is wearing a onesie. In one image, an adult hand displays Minor A's vagina.

At some point, Sanford Police Detective Barbara Gagne took over the case from Officer Brule and arranged to meet with Paradis to discuss some of the images found on the computer. She showed Paradis the Minor A photographs and Paradis identified Minor A as her daughter. Paradis said her daughter was "a very chubby baby" who had a visible crease in her right thigh, just like Minor A. She recognized the patterned quilt in the photographs as the quilt her aunt had made for her baby shower. She said the onesie Minor A wore in the photographs was the onesie her daughter "wore pretty much every day." Paradis also identified the finger in one of the photographs as Breton's finger based on its appearance and its short, always-bitten-to-the-quick fingernail.

Additionally, Special Agent Fasulo ran tests to determine how the Yahoo Messenger folders containing the child pornographic images were created and whether the images were exchanged.[7] His

---

[7] Special Agent Fasulo performed these tests by installing Yahoo Messenger on two computers and monitoring their interaction as files were exchanged. Because someone had uninstalled Yahoo Messenger and wiped the data from the laptop before Paradis gave it to the police, Special Agent Fasulo was unable to determine what

investigation revealed that the Yahoo Messenger program automatically created a folder whenever a chat took place. Each folder contained all the files that were sent or received during a particular chat. Ordinarily, the folder would be deleted when the user closed the program, but if the program "crashed," or terminated abnormally, the folder would remain on the computer. Furthermore, Special Agent Fasulo could ascertain whether a particular image in a folder had been sent or received based on whether its file name contained a specific sequence of symbols and letters.

Special Agent Fasulo's analysis indicated that at least one of the three Minor A images was sent from the laptop using Yahoo Messenger on April 27, 2009 at 11:42 a.m.; the other two images were either sent or received at roughly the same time.[8] He also found that an iPhone registered to Breton was connected and synchronized with the laptop about forty minutes before these

_____

precise version of Yahoo Messenger was used on the laptop. Accordingly, he utilized several different versions of Yahoo Messenger available around the time when the files allegedly were exchanged in order to obtain his results.

We note that the operating system on the laptop was Microsoft Windows Vista Home, while the computers used by Special Agent Fasulo ran Microsoft Windows Vista Business. Special Agent Fasulo testified that he thought the difference between these systems for his purposes was negligible, and so there was no need to procure Windows Vista Home for the test computers.

[8] Special Agent Fasulo did not find any metadata, or embedded "data about data," within the Minor A image files to indicate when or how those images were created.

images were exchanged.  Other evidence showed that Breton did not report to work that day until 3:30 p.m.

In addition to the images, Special Agent Fasulo discovered registry files on the laptop with names he had encountered in other child pornography investigations, including: "Pthc," meaning "preteen hardcore;" "Lolita," meaning an underage female; and "girl-in-tent-11-YO," meaning "11-years-old."[9]  But he located no corresponding image files on the laptop.

Special Agent Fasulo also came across a program called GigaTribe, which, like Yahoo Messenger, allows users to upload images or files to share on the internet.  In a memory folder created by the operating system that stores information in the event of a crash, Special Agent Fasulo found GigaTribe folders associated with the usernames "Royce-$$-2AOB" and "Shadowwind345B." In those folders, he identified files with names like "ptsc," meaning "preteen softcore," and "kids-teens-women-porno-lolitas-preteens-real-key-movs-r@y-gold-hussyfans-underage-girls-children-pedophilia-pthc."[10]  Again, corresponding image files were not found on the laptop.

Lastly, Special Agent Fasulo discovered a program called Internet Relay Chat, which brings users with similar interests

---

[9] Registry files store information about documents or images that have been opened on a computer.

[10] "R@y-gold" and "hussyfans" are known series of child pornography.

together in chat rooms. The program was saved to the C:Royce directory and associated with the nicknames "Shadow345" and "Shadowwind345," a username "nonesuch," and an e-mail address none@nowhere.com. The log files of chat rooms visited included names like "young-girl-sex," "dad-and-daughter-sex," "little-boy-sex-chat," "mom-daughter-sex," and "teen-sex-pics." Also spotted in the C:Royce directory was Breton's application to the University of New England.

## 2. The Desktop

No images or files containing child pornography were recovered from the desktop. However, Special Agent Fasulo's examination of the desktop's three hard drives revealed considerable past interactions with two web-sharing forums: imgsrc.ru ("Image Source Russia"), a website that allows users to upload images from servers in Russia into albums to share publicly or with password protection; and XNews, a newsgroup website where readers can comment on particular topics. There was evidence of past searches on Image Source Russia for such phrases as "12YO," "daughter," "naked," "girl," "sex," "14," and "14 plus girl," as well as evidence of webpages visited containing albums with titles and keywords like "love Lolita," "children," "young girls," "14YO topless," and "young nude preteen girls." And although the files themselves were missing, there was evidence of downloads from XNews including, "Pthc 11 YR son eat mom" and "O-R-G-A-S-I-S-M.mpg."

Special Agent Fasulo subsequently accessed the Image Source Russia website and found a user page registered to the user "Shadowwind345" at the e-mail address shadowwind345@yahoo.com. There were no images on Shadowwind345's user page. However, there was evidence of activity by this user. On March 6, 2009, Shadowwind345 posted a comment on a page by the username "Hershey" entitled "Young Bride," saying "I'd like to see your daughter pics. Email me at Shadowwind345@yahoo.com to trade." On May 24, 2009, Shadowwind345 commented on an album by the username "Low Jack" entitled "my dau," saying "Have more? Love to see more, Shadowwind345@yahoo.com if you want my passes or want to see my private daughter stuff."

## B. Pre-Trial Skirmishes

Based on this investigation, Breton was charged with three counts involving child pornography: (1) using a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct, in violation of 18 U.S.C. § 2251(a); (2) knowingly possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) knowingly distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2).

Before trial, the government moved in limine to admit Paradis's testimony regarding, among other things, Breton's aforementioned statements and text messages. Breton opposed, claiming they were covered by the marital communications privilege.

-11-

Breton also counter-moved to exclude evidence of file and chat room names that were suggestive of child pornography where no images were recovered, claiming the names were irrelevant, unfairly prejudicial, and unduly confusing.

After a motions hearing, the district judge granted the government's request to admit Paradis's testimony, applying an exception to the marital communications privilege for statements regarding an offense against a child of either spouse. The judge also denied Breton's motion to exclude suggestive file and chat room names.

## C. Trial and Sentencing

Breton's three-day jury trial began on May 8, 2012. At the close of the government's case and again at the end of trial, Breton moved for judgment of acquittal. Both motions were denied. On May 10, 2012, the jury convicted Breton on all three counts.

At Breton's sentencing hearing on October 12, 2012, the district judge sentenced Breton to concurrent imprisonment terms of 340 months for count one (production), 120 months for count two (possession), and 240 months for count three (distribution), with an additional fifteen years of supervised release.[11] This appeal followed.

---

[11] We will describe Breton's sentencing hearing at greater length below with respect to his sentencing challenge.

## II. Analysis

Breton raises four issues on appeal: (1) error in admitting his former wife's testimony about statements that he says were protected by the marital communications privilege, (2) error in admitting file and chat room names that were suggestive of child pornography where no images were recovered, (3) insufficiency of the evidence as to all three charges, and (4) error in calculating his sentence under the United States Sentencing Guidelines (the "Guidelines"). We address each of Breton's arguments in turn but find none convincing.

### A. Marital Communications Privilege

Breton invokes the marital communications privilege to challenge the district judge's admission of Paradis's testimony regarding two groups of statements Breton made to Paradis after he learned she had conveyed the laptop to the police. First, Breton told Paradis that she had "screwed everything up" and "he was going to go to jail and lose his job." Second, Breton text-messaged Paradis that he "should have sh[o]t her instead." Breton argues that both sets of statements are privileged because he made them to Paradis in confidence during their marriage. He says the judge erred by recognizing an exception to the marital communications privilege for offenses against a spouse's child and by applying such an exception to these statements, which he says were not related to a crime against his and Paradis's child.

-13-

We review the admission of evidence over a claim of privilege for abuse of discretion. In re Grand Jury Subpoena (Mr. S.), 662 F.3d 65, 69 (1st Cir. 2011). Where relevant to a determination of privilege, we review rulings on legal questions de novo and findings of fact for clear error. Id.

In addressing Breton's first claim of error, we note in general that the party asserting a privilege "bears the burden of showing that the privilege applies." See Vicor Corp. v. Vigilant Ins. Co., 674 F.3d 1, 17 (1st Cir. 2012). If the privilege is established, the burden shifts to the opposing party to show that an exception defeats the privilege. See id.

In a federal criminal case such as this, claims of privilege are governed by the common law as interpreted by the courts in light of their reason and experience. United States v. Rakes, 136 F.3d 1, 3 (1st Cir. 1998) (citing Fed. R. Evid. 501). The common law recognizes two related but distinct marital privileges: (1) the spousal testimony privilege, which allows one spouse to refuse to testify adversely against the other in criminal or related proceedings; and (2) the marital communications privilege, which permits a defendant to refuse to testify, and allows a defendant to bar his spouse or former spouse from testifying, as to any confidential communications made during their marriage. See United States v. Yerardi, 192 F.3d 14, 17-18 (1st Cir. 1999); United States v. Bey, 188 F.3d 1, 4 (1st Cir. 1999);

-14-

Rakes, 136 F.3d at 3.  Only the latter claim of privilege is at issue here.

The marital communications privilege exists to promote marital harmony and stability by "ensur[ing] that spouses . . . feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law."  United States v. Brock, 724 F.3d 817, 820-21 (7th Cir. 2013) (citation omitted) (internal quotation marks omitted); United States v. Banks, 556 F.3d 967, 974 (9th Cir. 2009).  Indeed, the protection of marital confidences is "regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails."  Wolfle v. United States, 291 U.S. 7, 14 (1934).

However, this privilege, like others, "is not limitless, and courts must take care to apply it only to the extent necessary to achieve its underlying goals."  See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) (discussing attorney-client privilege).  Accordingly, courts have long recognized an exception to the privilege when one spouse commits an offense against the other, thereby harming the marital relationship and thwarting the privilege's purpose. Trammel v. United States, 445 U.S. 40, 46 n.7 (1980) (saying the exception applies to spousal testimony privilege and marital communications privilege); see 1 McCormick On Evid. § 84 (7th ed.) (same); see

-15-

also <u>Wyatt</u> v. <u>United States</u>, 362 U.S. 525, 529 (1960) (applying exception to spousal testimony privilege).

Two of our sister circuits have expanded this "offense against spouse" exception to include an offense against a child of either spouse. <u>United States</u> v. <u>White</u>, 974 F.2d 1135, 1138 (9th Cir. 1992) (applying exception to marital communications privilege); <u>United States</u> v. <u>Allery</u>, 526 F.2d 1362, 1367 (8th Cir. 1975) (applying exception to spousal testimony privilege); <u>see also</u> <u>United States</u> v. <u>Cameron</u>, 556 F.2d 752, 755 (5th Cir. 1977) (acknowledging exception to spousal testimony privilege). Another has gone further, finding the exception covers offenses against a child-relative visiting in the home. <u>United States</u> v. <u>Bahe</u>, 128 F.3d 1440, 1446 (10th Cir. 1997).[12]

In <u>United States</u> v. <u>Allery</u>, 526 F.2d 1362, 1366-67 (8th Cir. 1975), the Eighth Circuit cogently explained why the "offense

---

[12] The remaining circuit courts, including this one, have not addressed the issue of exceptions for offenses against a child of either spouse or a child-relative. <u>See</u> Naomi Harlin Goodno, <u>Protecting "Any Child": The Use of the Confidential-Marital-Communications Privilege in Child-Molestation Cases</u>, 59 U. Kan. L. Rev. 1, 37 n.215 (2010). However, a few federal district courts in these circuits have recognized an expanded exception. <u>See</u> <u>United States</u> v. <u>Martinez</u>, 44 F. Supp. 2d 835, 837 (W.D. Tex. 1999) (holding that the marital communications privilege did not apply where a mother was accused of abusing her two minor children); <u>United States</u> v. <u>Mavroules</u>, 813 F. Supp. 115, 119-20 (D. Mass. 1993) (finding that the marital communications privilege did not apply where a wife alleged that her abusive husband had threatened to injure her father's reputation in order to extort money from her).

against spouse" exception should also cover an offense against a child of either spouse.[13]

First, a crime against a spouse's child, like a crime against a spouse, profanes the deep bond of trust and love between marital partners and disrupts family harmony.  Id. at 1366.  Such an offense is irreconcilable with the primary purposes of the marital communications privilege: to promote marital unity and stability.  White, 974 F.2d at 1138.

Second, there is frequently greater-than-usual need for parental testimony in prosecutions for crimes against children. Allery, 526 F.2d at 1366.  Tragically and perversely, child abuse occurs most often in the home at the hands of a parent or parent-substitute.  Id.; Bahe, 128 F.3d at 1446.  Testimony regarding confidential marital communications may constitute critical evidence in such cases.  See Bahe, 128 F.3d at 1446.

Third, like all privileges, the marital privileges hamper the truth-seeking process and must be interpreted narrowly. Trammel, 445 U.S. at 50 (quoting Elkins v. United States, 364 U.S. 206, 234 (1960) (Frankfurter, J. dissenting)); see Allery, 526 F.2d at 1366 (quoting Hawkins v. United States, 358 U.S. 74, 81 (1958) (Stewart, J. concurring)).

_____

[13] Though Allery involved the spousal testimony privilege, its rationale is equally applicable to the marital communications privilege.  White, 974 F.2d at 1138; see also Trammel, 445 U.S. at 46 n.7.

Finally, there is overwhelming state legislative and judicial authority for the proposition that a crime against a spouse's child renders the marital communications privilege inapplicable.  Allery, 526 F.2d at 1366-67; see, e.g., Kan. Stat. Ann. § 60-428(b)(3); Miss. R. Evid. 504(d); Utah R. Evid. 502(e)(3); Munson v. State, 959 S.W.2d 391, 392 (Ark. 1998); State v. Michels, 414 N.W.2d 311, 315-16 (Wis. Ct. App. 1987).[14]  Indeed, of the five state and territorial jurisdictions comprising the First Circuit, it appears that none would uphold a claim of the marital communications privilege in cases involving a crime against a spouse's child.[15]

---

[14] Approximately half of the states have adopted a "child of either spouse" or "child who resides in the home" exception to the marital communications privilege.  Goodno, Protecting "Any Child", supra, at 17-18, 20.  The other half have adopted a broader exception for crimes against any child.  Id. at 19-20.

[15] Maine law establishes an exception to the marital communications privilege where "one spouse is charged with a crime against the person or property of (1) the other, (2) a child of either, [or] (3) any person residing in the household of either . . . ."  Me. R. Evid. 504(d).
    Massachusetts law excepts "child abuse proceedings, including incest," from the marital communications privilege.  Mass. Gen. Laws Ann. ch. 233 § 20.  Massachusetts courts have interpreted a similar exception to the spousal testimony privilege to apply to "abuse of any child."  Villalta v. Commonwealth, 702 N.E.2d 1148, 1152 (Mass. 1998).
    New Hampshire courts recognize a public policy exception to the marital communications privilege for cases involving sexual abuse of a child of either spouse residing in the home.  State v. Pelletier, 818 A.2d 292, 298 (N.H. 2003) (interpreting N.H. R. Evid. 504).
    Puerto Rico law contains an exception to the marital communications privilege for "[a] crime against the person or property of the other spouse or a child of either."  P.R. Laws Ann.

-18-

Tackling this issue for the first time, we agree with our sister circuits and the vast majority of states that the "offense against spouse" exception to the marital communications privilege must be read to cover an offense against a child of either spouse in order to further the privilege's underlying goals of promoting marital and family harmony.[16]  Accordingly, we find that the district judge did not err by recognizing an exception to the marital communications privilege for offenses against a spouse's child.

We further hold that the district judge did not abuse his discretion by applying this exception to the statements at issue here.  Breton sought to exclude Paradis's testimony about what he said to her after she turned the laptop over to police, including

---

tit. 32, Ap. IV R. 27(D)(2)(i).

Rhode Island courts interpret state statute as permitting a witness-spouse to testify voluntarily about confidential marital communications in a criminal case, regardless of whether she is a victim and notwithstanding the defendant-spouse's objection.  See State v. Angell, 405 A.2d 10, 15-16 (R.I. 1979) (citing State v. Kenyon, 26 A. 199 (R.I. 1893), and interpreting R.I. Gen. Laws Ann. § 12-17-10).

[16] Because this case involves a crime against the natural child of both spouses, we need not address the scope of this exception as to other children — a question upon which federal and state courts have reached no consensus.  Compare Bahe, 128 F.3d at 1446 (extending exception to cover offense against an 11-year-old relative visiting the home), and Banks, 556 F.3d at 975-76 (stating that the exception should cover a spouse's birth child, step-child, or "the functional equivalent," but declining to extend exception to offense against a grandchild who was visiting and had formerly resided in the home); see generally Goodno, Protecting "Any Child", supra, at 12-22 (discussing the different versions of exception adopted by federal and state courts and legislatures).

that she had "screwed everything up," "he was going to go to jail and lose his job," and he "should have sh[o]t [her]." Breton says that even if the district judge appropriately adopted an exception to the marital communications privilege for crimes committed against a spouse's child, the judge should not have permitted Paradis to testify about these statements because they were not related to a crime against his and Paradis's child.

We disagree. Here, all three crimes charged — production, possession, and distribution — covered crimes against Minor A, whom Paradis identified as her daughter. As the district judge determined, Breton's statements about losing his job, going to jail, and shooting Paradis are reasonably interpreted as relating to Breton's worries about the impending discovery of his crimes against his own child. Whether the jury should have been instructed to disregard this evidence in connection with the charged crimes against other children (on the theory that the marital communications privilege applies in that context) is a question not before us as no such instruction was requested. See Fed. R. Evid. 105 (stating that when evidence is admissible only for a limited purpose, "the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly") (emphasis added); 21A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence § 5065, at 329-30 (2d ed. 2005) ("[W]ithout a request the trial court does not

err in not giving [a limiting] instruction."). Consequently, we cannot find that the district judge abused his discretion by concluding that the exception to the marital communications privilege for offenses committed against the child of either spouse applied here. We find that the district judge did not err by admitting Paradis's testimony about these statements.

## B. Suggestive File and Chat Room Names

Breton next challenges the admission of file and chat room names that allude to child pornography where no actual images were recovered. He contends that this evidence was not relevant to the charged crimes and that its admission at trial was unfairly prejudicial and confusing.

Breton objected to the admission of this evidence on these grounds before and during trial, thereby preserving these issues for appeal. We review his preserved challenges to the admission of this evidence for abuse of discretion. United States v. Brown, 669 F.3d 10, 21 (1st Cir. 2012).

### 1. Relevancy

Breton first argues that file and chat room names suggestive of child pornography were not relevant to the charged crimes where no corresponding images were recovered. As we have said before, "[a] relevancy-based argument is usually a tough sell." Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010). Evidence Rule 401 defines relevant evidence expansively as

"'evidence having _any_ tendency to make the existence of any fact that is of consequence' more or less probable."  Id. (quoting Fed. R. Evid. 401).  This is not a high bar, and we give a district judge "considerable leeway in deciding whether the contested evidence satisfies this . . . standard."  Id.

To prove that a defendant knowingly possessed child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) or knowingly distributed child pornography in violation of 18 U.S.C. § 2252A(a)(2) requires a showing of scienter.  Courts, including this one, consider file, chat room, and website names suggestive of child pornography relevant to proving a defendant's knowledge of such materials.  See, e.g., United States v. Rogers, 714 F.3d 82, 86-87 (1st Cir. 2013) (finding that web browser history of "numerous visits to websites related to, or with names indicative of, child pornography" helped show defendant knowingly possessed child pornography); United States v. Pires, 642 F.3d 1, 9 (1st Cir. 2011) ("[A] defendant's use of search terms associated with child pornography can support a finding that he knew that the images retrieved contained child pornography."); United States v. Fabiano, 169 F.3d 1299, 1306 (10th Cir. 1999) (explaining that defendant's participation in "preteen" chat room for several months prior to exchange of images helped show defendant was aware of nature of images before he received them).  Furthermore, evidence that a person deliberately deleted or attempted to delete files containing

child pornography tends to show that the person was aware of the files and their illicit nature.  See Rogers, 714 F.3d at 87.

Here, Breton opposes the admission of file and chat room names suggestive of child pornography where no actual images were found on the computer.  Specifically, he challenges the introduction of registry file names like "pthc" ("preteen hardcore") and "girl-in-tent-11-YO," ("11-year-old"), which were found on the laptop without corresponding image files.  He also protests the admission of GigaTribe file names like "kids-teens-women-porno-lolitas-preteens-real-key-movs-r@y-gold-hussyfans-underage-girls-children-pedophilia-pthc" (naming known series of child pornography), which were likewise found on the laptop without image files.  He further objects to the admission of Internet Relay Chat log evidence of chat room names like "young-girl-sex" and "dad-and-daughter-sex," which were also found on the laptop and not associated with image files.

The district judge admitted this evidence over Breton's objections because he believed the file and chat room names were relevant to "the [g]overnment's effort to establish the scienter requirement and to show what [Breton] was doing . . . on his computers, even though there may not have been images in those particular files."  He found that "the combination of file names and chat rooms cumulatively [could] be used to argue to the jury that [Breton] was, in fact, involved in child pornography."

We agree.  The presence of files with names indicative of child pornography — even absent further proof of what, if anything, those files contained — tends to make it more probable that Breton knowingly was involved with child pornography.  See, e.g., Rogers, 714 F.3d at 86-87.  This is particularly true where actual images of child pornography were found elsewhere on the same computer.  Moreover, prosecutors could argue that the fact that the hidden files remained on the laptop without their visible counterparts after Breton both concealed the laptop from police and selectively wiped its hard drive suggests Breton deliberately attempted to delete the files in toto and was aware of their content.  See id. at 87.  This evidence easily satisfies the low bar of relevancy set out in Rule 401.

## 2. Unfair Prejudice and Confusion

Breton next argues that evidence of file and chat room names implying child pornography where no actual images were recovered should have been excluded as unfairly prejudicial and confusing.  Though possessing Rule 401 relevancy, evidence may nevertheless be excluded under Evidence Rule 403 "'if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues.'" United States v. Gentles, 619 F.3d 75, 87 n.4 (1st Cir. 2010) (quoting Fed. R. Evid. 403).  However, this rule protects defendants only against evidence that would produce unfair prejudice, as "'[b]y design, all evidence is meant

-24-

to be prejudicial.'"  United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (quoting United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989)).  Evidence produces unfair prejudice when it "invites the jury to render a verdict on an improper emotional basis."  Id.

We give great deference to a district judge's balancing of probative value versus unfair prejudice.  Gentles, 619 F.3d at 87.  This is true even when a judge does not expressly explain the Rule 403 balancing process on the record.  See, e.g., United States v. Smith, 292 F.3d 90, 98 (1st Cir. 2002) (determining that absence of findings on record does not preclude meaningful appellate review); United States v. Santagata, 924 F.2d 391, 394 (1st Cir. 1991) (quoting United States v. De La Cruz, 902 F.2d 121, 123 (1st Cir. 1990)) ("'[O]n-the-record findings as to the probative value/prejudicial effect balance' . . . are not always necessary."); United States v. Foley, 871 F.2d 235, 238 (1st Cir. 1989) (finding no abuse of discretion in exclusion of evidence despite absence of express findings).  "'[O]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district [judge's] on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'"  Gentles, 619 F.3d at 87 (quoting United States v. Li, 206 F.3d 78, 84-85 (1st Cir. 2000)).

Here, Breton objects to the admission of the file and chat room names, even if relevant, on the grounds of unfair prejudice and confusion. Because the district judge did not refer directly to Rule 403 balancing on the record for this issue, Breton posits that the judge either failed to conduct the requisite analysis or reached an incorrect result. He says the probative value of the file and chat room names was substantially outweighed by the danger of unfair prejudice and confusion because "it could not be determined whether there was actual child pornography in the files" and "[t]he files could have contained images of anything," but the names insinuated that the files held pornographic content.

We disagree. Preliminarily, we note that the absence of an express Rule 403 finding here on this particular piece of disputed evidence does not mean the district judge failed to perform this analysis. See Smith, 292 F.3d at 98. The judge's handling of other disputed evidence demonstrates that he was aware of his responsibility to weigh the relevant factors and perform Rule 403 balancing prior to admitting such evidence. See De La Cruz, 902 F.2d at 123 n.1. In fact, he performed precisely this analysis on the record with respect to evidence of the previous investigation of Breton for an unrelated computer crime and excluded that evidence as a result. We may therefore assume that the judge tacitly performed this same balancing with respect to the evidence of file and chat room names before concluding that its

probative value won out over its potential for creating unfair prejudice or confusion.

On this record as a whole, we can meaningfully review the district judge's ruling, see Smith, 292 F.3d at 98, and we agree with his determination. File and chat room names incorporating lewd, obscene, or graphic terms suggestive of child pornography are, of course, prejudicial to Breton, but not unfairly so. They are not aimed to solicit an improper emotional response from the jury. In fact, compared with other evidence offered at Breton's trial — including actual images of child pornography and Paradis's testimony identifying Breton and their young daughter in some of those images — this evidence is rather mild. We trust the jury was able to distinguish between files with and without corresponding illicit images and to give each evidentiary submission the weight it deserved. Also, Breton had ample opportunity to minimize the risk of any confusion through cross-examination of Special Agent Fasulo, who testified about the file and chat room names at trial. When Breton's counsel asked Special Agent Fasulo whether he knew what was contained in those files, Special Agent Fasulo admitted that he did not know and that it was possible those files could have contained something other than child pornography.

Furthermore, we see no "extraordinarily compelling circumstances" here — and Breton offers none — that would warrant reversal of the district judge's firsthand weighing of the

relative probative value and potential prejudicial or confusing effect of this evidence. In consequence, we find the district judge committed no abuse of discretion by admitting the file and chat room names into evidence.

## C. Sufficiency of the Evidence

Third, Breton challenges the sufficiency of the evidence as to all three counts of his conviction, claiming the government did not prove beyond a reasonable doubt that he produced, knowingly possessed, or knowingly distributed child pornography.

Because Breton moved for judgment of acquittal both at the close of the government's case and at the end of trial, we review his preserved sufficiency claims de novo. United States v. Howard, 687 F.3d 13, 19 (1st Cir. 2012). In doing so, we consider the evidence, both direct and circumstantial, in the light most favorable to the verdict. Id. We will reverse only if we find that "even after 'crediting the government's witnesses and drawing all reasonable inferences in its favor,' no levelheaded jury could have found [Breton] guilty." United States v. Guerrier, 669 F.3d 1, 7 (1st Cir. 2011) (quoting United States v. Aranjo, 603 F.3d 112, 116 (1st Cir. 2010)). That Breton might develop "a plausible theory of innocence" will not help him: "the issue is not whether a jury rationally could have acquitted but whether it rationally could have found guilt beyond a reasonable doubt." United States v. Seng Tan, 674 F.3d 103, 107 (1st Cir. 2012). For these reasons,

-28-

challenging the sufficiency of the evidence is usually a longshot, id., and Breton's attempts miss the mark.

## 1. Production

Breton first says the government lacked sufficient evidence to prove he produced child pornography. 18 U.S.C. § 2251(a) criminalizes the use of a minor in any sexually explicit conduct for the purpose of producing a visual depiction of that conduct.[17] The government's evidence on this charge centered around three photographs of the genitals of an unidentified female child, dubbed "Minor A," found in the laptop's hidden Yahoo Messenger folder. The government averred that Breton had taken these photographs of his young daughter.

Breton claims the jury did not have sufficient evidence to conclude beyond a reasonable doubt that he produced these images. Specifically, he cites a lack of computer forensic evidence conclusively linking him to the Minor A images and says

---

[17] 18 U.S.C. § 2251(a) reads in relevant part:

Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished as provided . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer . . . .

Breton has never disputed that the Minor A images qualify as child pornography and satisfy the interstate commerce element.

-29-

a "biased" Detective Gagne was "desperate" to connect him to the photographs even if the evidence did not point in his direction. He argues Detective Gagne "used" Paradis to try to establish that Minor A was their daughter, and says "[t]he issue becomes the influence a detective can have on the case if [she has] a scared and emotional mother, trying to protect her child, as the only witness to identify a child in an image of child pornography in which the child's face does not appear." His argument essentially boils down to misidentification due to slanted police work: Breton says he did not take the photographs and Minor A was not his daughter, but Detective Gagne was fixated on demonstrating the opposite.

However, viewing the evidence, as we must, in the light most favorable to the verdict, we cannot help but conclude that a sound-minded jury could find Breton produced the images in question. The government's evidence linking Breton and his daughter to the Minor A photographs was manifold. It included, among other things: Paradis's identification of Minor A as her and Breton's daughter based on Minor A's distinctive thigh indentation, much-worn onesie, and unique, homemade blanket; Paradis's identification of the adult finger in one photograph as Breton's based on its appearance and its short fingernail; computer forensic evidence showing that the Minor A images were distributed from the laptop shortly after an iPhone registered to Breton was connected

to the laptop, at a time of day when Breton was not at work; and messages posted on a Russian image-sharing website by a user named Shadowwind345 (which matched the Yahoo Messenger username that the government argued belonged to Breton) asking other users to trade "daughter pics" and offering to share "my private daughter stuff."

Based on this evidence, a rational jury could conclude that Breton produced sexually explicit photographs of his daughter and offered to trade and did trade them with others. It was up to the jury to weigh this evidence against Breton's claims of inconclusive computer forensics and biased police work. Viewing the evidence in the light most favorable to the verdict, we cannot say a levelheaded jury could not have found Breton guilty as charged.

## 2. Possession

Breton next says the government failed to put forth sufficient evidence to prove that he knowingly possessed child pornography. 18 U.S.C. § 2252A(a)(5)(B) prohibits knowing possession of any material that contains an image of child pornography.[18] Breton's challenge focuses on the element of

_____

[18] 18 U.S.C. § 2252A(a)(5)(B) reads in relevant part:

[Any person who] knowingly possesses, or knowingly accesses with intent to view, any . . . material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using

-31-

knowing possession. In particular, he claims he could not have knowingly possessed the images of child pornography found in the laptop's hidden Yahoo Messenger folder because he was not aware the folder existed.

To satisfy the knowing possession requirement, the government must demonstrate that Breton possessed, and knew he possessed, child pornography. Rogers, 714 F.3d at 86. Such knowledge often is shown through circumstantial evidence. Pires, 642 F.3d at 8-9. For example, a defendant's history of visits to websites with a child pornography connection or use of search terms associated with child pornography can support a finding that the defendant knew the images he retrieved contained child pornography. See Rogers, 714 F.3d at 86; Pires, 642 F.3d at 9. Storage of child pornography images in a computer directory affiliated with internet-sharing can indicate those images were downloaded from or transmitted to those websites. Rogers, 714 F.3d at 86. And a defendant's intentional attempt to delete child pornography files, such as by placing them in a computer's recycle bin, can suggest he was aware of the files and their contents. Id. at 87.

---

materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer [shall be punished as provided].

Again, Breton has never disputed that the images found qualify as child pornography and satisfy the interstate commerce element.

Breton's argument that he could not have knowingly possessed the images of child pornography found in the laptop's hidden Yahoo Messenger folder therefore misses the point. Though the government concedes Breton may not have known that Yahoo Messenger had saved these particular image files in this particular location, the government introduced considerable other evidence that Breton knew the laptop contained images of child pornography. This evidence included a history of visits to websites and chat rooms connected with child pornography (such as Image Source Russia and Internet Relay Chat rooms named "young-girl-sex" and "dad-and-daughter-sex"); web searches for terms associated with child pornography (e.g., "12YO," "daughter," "naked," "girl," and "sex"); and the discovery of child pornography images in the hidden Yahoo Messenger file affiliated with internet-sharing. It also included evidence that Breton concealed the laptop and selectively wiped its data before Paradis handed it over to police, which could suggest Breton knew the laptop held child pornography and wanted to get rid of it before the police found it. From this and other evidence presented at trial, a jury reasonably could infer that Breton knowingly possessed child pornography beyond a reasonable doubt. We will not disturb its finding.

### 3. Distribution

Last, Breton says the government did not provide sufficient evidence to prove he distributed child pornography. 18 U.S.C. § 2252A(a)(2) proscribes the knowing distribution of child pornography.[19] To demonstrate that Breton distributed child pornography, the government relied primarily on Special Agent Fasulo's forensic analysis of the laptop and the Yahoo Messenger program. Special Agent Fasulo ran tests to determine how the Yahoo Messenger program works. He testified that he could ascertain whether a particular file created by Yahoo Messenger had been sent or received based on whether its name contained a certain sequence of symbols and letters. Based on this information, he opined that certain files containing images of child pornography on the laptop had been sent or received.

Breton argues that Special Agent Fasulo's testing was incomplete, inaccurate, and incapable of supporting a finding that he had distributed child pornography beyond a reasonable doubt. To

---

[19] 18 U.S.C. § 2252A(a)(2) reads in relevant part:

[Any person who] (2) knowingly receives or distributes-- (A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or (B) any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer [shall be punished as provided].

support his claim, Breton says Special Agent Fasulo's methods were flawed because he did not use the precise versions of Microsoft Windows and Yahoo Messenger that were installed on the laptop when he simulated sending and receiving files. While the laptop ran Windows Vista Home, Special Agent Fasulo's test computers ran Windows Vista Business. Furthermore, because someone had uninstalled Yahoo Messenger and used wiping software on the laptop before the police retrieved it from Paradis, Special Agent Fasulo could only guess at which version of Yahoo Messenger had run on the laptop previously. In the end, Breton says, Special Agent Fasulo could not say with certainty whether the versions of those programs that were installed on the laptop would have behaved or interacted identically to the versions of those programs that Special Agent Fasulo actually tested.

However, this argument is unavailing. Breton's counsel rigorously cross-examined Special Agent Fasulo on this point and others relating to the testing process at trial. Breton's counsel asked specific questions about variations among different versions of Yahoo Messenger, including how they exchanged files and their interactions with Windows Vista. This questioning challenged the reliability of Special Agent Fasulo's testing process and methodology. It was for the jury to decide whether to trust Special Agent Fasulo's testimony and analysis over Breton's criticisms of his procedures. Crediting this evidence and drawing

all reasonable inferences in the verdict's favor, we find that a jury could (and did) rationally find Breton guilty of distribution. Accordingly, the last of Breton's sufficiency challenges fails, and we find sufficient evidence supports the jury's conviction on all three counts.

## D. Sentencing

Finally, Breton challenges his sentence. Breton claims the district judge erred by computing a Guidelines sentence of 720 months because none of the counts of his conviction permits the imposition of a life sentence and, according to Breton, the United States Sentencing Commission (the "Commission") "caps a life sentence at 470 months." We will add more detail to Breton's argument in a moment. At this point, though, we note that Breton in fact received a sentence of 340 months of imprisonment, plus fifteen years of supervised release.

We review a district judge's sentence for reasonableness, which is a two-part inquiry. Gentles, 619 F.3d at 88 (quoting United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008)). We begin by determining whether the district judge committed any procedural errors, such as, among other things, "'failing to calculate (or improperly calculating) the Guidelines range.'" Id. (quoting Politano, 522 F.3d at 72). Where the district judge has made no such error, we then consider "the substantive

reasonableness of the sentence actually imposed and review [it] for abuse of discretion."  Politano, 522 F.3d at 72.

Within this rubric, we afford the district judge wide discretion, as "after the [judge] has calculated the [Guidelines range], 'sentencing becomes a judgment call.'"  Id. at 73 (quoting United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008)).  That we, "'sitting as a court of first instance, would have sentenced the defendant differently,'" is not a basis for reversal.  United States v. Stone, 575 F.3d 83, 94 (1st Cir. 2009) (quoting Martin, 520 F.3d at 92).  Rather, we defer to the sentence as reasonable so long as it is supported by "'a plausible sentencing rationale'" and reaches "'a defensible result.'"  See Gentles, 619 F.3d at 89 (quoting Martin, 520 F.3d at 96).

### 1. Breton's Sentencing Hearing

Breton's sentencing hearing took place on October 12, 2012.  The district judge began by recounting the materials he had received and reviewed since the pre-sentence conference, including the parties' sentencing memoranda with accompanying exhibits and the revised pre-sentence report with Breton's objections.  After hearing from the victims[20] and Breton, the district judge found the facts as set out in the revised pre-sentence report.

_____

[20] In addition to Paradis, who spoke on behalf of herself and the couple's daughter, the judge received victim impact statements from several of the victims appearing in photographs found on the laptop who were identified through the  National Center for Missing and Exploited Children database.

Next, the district judge calculated Breton's Guidelines sentence range. Pursuant to the Guidelines' rules of grouping, he grouped counts one (production) and three (distribution). See U.S.S.G. § 3D1.2. He then set the base offense level for count two (possession) at eighteen. See U.S.S.G. § 2G2.2. Adopting the pre-sentence report's recommended adjustments, he calculated the total offense level for count two to be thirty-four.[21] For counts one and three combined, he set the base offense level at thirty-two. See U.S.S.G. § 2G2.1. Again applying the pre-sentence report's recommended adjustments, he determined that a total offense level of forty-three governed.[22] Based on Breton's lack of past criminal history, he placed Breton in criminal history category I. Breton does not challenge any of these classifications or calculations.

---

[21] The district judge made the following adjustments: He added two levels because the materials included images of prepubescent minors; two levels because Breton distributed the materials; four levels because some of the images portrayed sadistic or masochistic conduct or other depictions of violence; two levels because the images were found on a computer; four levels based on the quantity of images found; and two levels for obstruction of justice because Breton's wiping of the laptop was designed to impede the investigation of his conduct.

[22] The district judge made the following adjustments: He added four levels because the victim was less than twelve years old; two levels for the sexual contact; two levels because Breton distributed at least one image of the victim; two levels because he was the parent of the minor victim; and two levels for the obstruction of justice. He declined to include a reduction for acceptance of responsibility, but he reduced the total offense level from forty-four to forty-three because forty-four is higher than any level in the Guidelines table.

At total offense level forty-three and criminal history category I, the Guidelines sentence was life in prison. <u>See</u> U.S.S.G. § 5A (Sentencing Table). However, as the district judge noted, a maximum term of life was not available under any of the charged statutes: the production count carried a minimum of fifteen years and a maximum of thirty years, <u>see</u> 18 U.S.C. §§ 2251(a), 2251(e); the possession count set a maximum of ten years, <u>see</u> 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2);[23] and the distribution count provided for a minimum of five years and a maximum of twenty years, <u>see</u> 18 U.S.C. §§ 2252A(2), 2252A(b)(1). Under the Guidelines, "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence [is] the guideline sentence." U.S.S.G. § 5G1.1(a). Accordingly, the district judge added the maximum statutorily authorized penalties for each count of Breton's conviction — thirty years for count one, ten years for count two, plus twenty years for count three — to set Breton's total Guidelines sentence at sixty years, or 720 months.

---

[23] 18 U.S.C. § 2252A(b)(2) sets a maximum term of ten years generally, but it raises the maximum to twenty years for a violation of 18 U.S.C. § 2252A(a)(5)(B) "if any image of child pornography involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age." Accordingly, it would seem based on the facts of this case that the appropriate maximum on the possession count would in fact be twenty years, rather than ten years. However, the district judge did not use the twenty-year maximum to calculate Breton's Guidelines sentence and neither party has challenged this aspect of his calculation, so we need not address this distinction here.

Breton objected to setting the Guidelines range at 720 months. Relying on an appendix to the Commission's 2011 Sourcebook of Federal Sentencing Statistics (the "Sourcebook"), Breton argued that the Commission had capped a life sentence at 470 months, meaning that a 720-month sentence would far exceed what was considered a life sentence. Because the charged statutes did not authorize imposition of a life sentence, he argued the statutory maximum (and, consequently, the Guidelines sentence) that applied to him must be below 470 months. Returning to the Guidelines, Breton argued he should be subject to the next-highest Guidelines sentence offered below life imprisonment: 360 months. See U.S.S.G. § 5A (Sentencing Table).

The section of the Sourcebook to which Breton referred sets forth a description of the variables used to generate statistics about federal sentencing. The relevant language reads as follows:

> **Length of Imprisonment**
> Using sentencing information obtained from the Judgment and Commitment Order, Length of Imprisonment is reported as the mean and median terms of imprisonment . . . ordered for cases committed to the Bureau of Prisons . . . . In most cases for which the exact term is unknown, the Judgment and Commitment Order merely specifies a sentence of time served. Prior to fiscal year 1993, the Commission defined life sentences as 360 months. However, to reflect life expectancy of federal criminal defendants more precisely and to provide more accurate length of imprisonment information, life sentences and

-40-

> **all sentences above 470 months are now capped at 470 months**.

Sourcebook, Appendix A, at 3 (emphasis added).  Similar language describes variables used to tabulate sentence length.  <u>Id.</u>

The district judge disagreed with Breton's interpretation of this text.  Rather than "capping" life sentences as effectuated at 470 months, this was "an explanation of how the Commission staff compiled their statistics and data."  He went on:

> This . . . comes from a source book of sentencing statistics where the Commission tries to put together facts and figures to show what is going on and where there is no identified length of sentence, the statistician has to insert something so that they can add things in meaningful numbers and I understand that's where the 470 months comes from, an attempt to reflect the life expectancy of people who are committed for life.

In other words, the Sourcebook's explanation had nothing to do with calculating the Guidelines sentence range.

Consequently, the district judge maintained that Breton's Guidelines sentence range was up to 720 months.  He considered whether downward departures were warranted but applied none because the Guidelines generally forbid such departures in child pornography cases.  <u>See</u> U.S.S.G. § 5K2.0.  He then weighed the statutory factors to be considered in imposing a sentence under 18 U.S.C. § 3553(a).  On the one hand, the abhorrent nature of the offense (particularly against Breton's own child) and the need for adequate deterrence called for harsh punishment.  <u>See</u> 18 U.S.C.

§ 3553(a).  On the other, Breton's history and characteristics were "generally good:" this was his first offense, and by all accounts he appeared to be "intelligent, hardworking, [and] respected by his employer, his employees, [and his] family."  See id.  According to the district judge, a strong sentence and a term of supervised release would protect the public.  See id.  The judge also expressly considered the interests of proportionality, promoting respect for the law, imposing just punishment, and avoiding unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  See id.

Finally, the district judge observed that his overall duty was to impose a procedurally and substantively reasonable sentence.  In his view, a 720-month sentence was plainly not reasonable.  The government had argued that a twenty-five to thirty-year sentence would be appropriate; Breton argued that a fifteen-year sentence (the statutory minimum for count one) would be more reasonable.  Considering the factors outlined above, the judge agreed with the government.  He settled on a sentence of 340 months (twenty-eight years and four months) for count one, to run concurrently with 120 months for count two and 240 months for count three, followed by a fifteen-year term of supervised release.

## 2. Procedural and Substantive Reasonableness

On appeal, Breton alleges a single procedural error: the improper calculation of his Guidelines sentence based on what he claims is an incorrect understanding of what constitutes a life sentence. Relying on the Sourcebook, he reprises his trial argument that any sentence above 470 months is tantamount to a life sentence, so the district judge was required to set his Guidelines sentence below that amount in order to avoid procedural error.

Like the district judge, we reject Breton's argument. Though 470 months may be an accurate statistical representation of the actual length of many life sentences — and may indeed be equivalent to a life sentence for many individuals — there is no "cap" within the Guidelines that limits life sentences to 470 months, and we have no reason to believe the Commission intended to set such a limit by publishing its statistical analysis. Accordingly, the district judge followed appropriate procedure when, upon finding that the recommended Guidelines range of a life sentence was unavailable for the crimes charged, he combined the respective statutory maximum penalties to set Breton's Guidelines sentence at 720 months. See U.S.S.G. § 5G1.1(a). There was no procedural error here.

Furthermore, we cannot say the district judge abused his discretion by imposing a sentence of 340 months. This term is less than half the length of the Guidelines sentence that Breton opposed

-43-

so vigorously, and it is twenty months below the maximum sentence for count one of Breton's conviction.  See 18 U.S.C. §§ 2251(a), 2251(e).  It represents the district judge's comprehensive understanding of the facts and careful weighing of the § 3553(a) factors at play in this case.  Moreover, Breton himself offers no argument against the substantive reasonableness of the sentence actually imposed at this stage of the case.

We have previously expressed our view that the Guidelines sentence ranges that operate in child pornography cases are harsher than necessary.  See Stone, 575 F.3d at 97.  However, under the applicable Guidelines, the sentence imposed here was both procedurally and substantively reasonable.  Accordingly, Breton's challenge fails.

## III. Conclusion

For the reasons stated, we affirm Breton's convictions and his sentence.