# United States Court of Appeals
## For the First Circuit

No. 20-2143

UNITED STATES OF AMERICA,

Appellee,

v.

GEORGE ROYLE V,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Thompson, Circuit Judges.

Jonathan G. Mermin, with whom Preti, Flaherty, Beliveau & Pachios, LLP was on brief, for appellant.
John M. Pellettieri, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Darcie N. McElwee, United States Attorney, Julia M. Lipez, Assistant United States Attorney, Kenneth A. Polite, Jr., Assistant Attorney General, U.S. Department of Justice, and Lisa H. Miller, Acting Deputy Assistant Attorney General, U.S. Department of Justice, were on brief, for appellee.

November 14, 2023

**HOWARD, Circuit Judge**.  George Royle V (Royle) appeals from his conviction by a jury for possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Specifically, he argues that the district court erred in denying his motion to suppress the derivative fruits of a warrantless search of his home, and in denying his motion to dismiss the indictment due to inadequate notice of that search.  He also contends that the government's trial evidence was insufficient to support his conviction.  We affirm.

## I.

In late June 2015, agents with the Department of Homeland Security (DHS) obtained a video depicting suspected child pornography that had been shared over the internet by a computer using an IP address assigned to a home in Portland, Maine. Investigators learned that the home was owned and occupied by Royle, a local attorney, and that its internet service was registered in his name.

On several occasions beginning July 1, 2015, DHS Special Agent David Fife (SA Fife) conducted surveillance outside Royle's home.  Among other observations, he noted a man matching Royle's physical description standing in the driveway and entering the house, as well as a car registered to Royle and his ex-wife parked near the house.  SA Fife also conducted surveillance of Royle's

law firm, where he observed this same man and car in the parking lot. At one point during his surveillance of the home, SA Fife observed Royle "embrace and kiss an unknown white female," who then left in a separate vehicle.

While this surveillance was ongoing, SA Fife prepared documents to apply for a search warrant for Royle's home. For instance, on Monday, July 6, 2015, SA Fife sent a draft search warrant affidavit to a federal prosecutor, seeking review and feedback. The two discussed edits to the draft over the next two days and, on the morning of July 8, planned via email to seek and execute a warrant for Royle's home on Monday, July 13. As reflected in their emails, this agreed-upon timing was intended to accommodate staffing concerns and allow sufficient time for internal approval.

During the evening of July 8, SA Fife and another DHS agent continued surveillance of Royle's home. There, they observed that the front door and a few windows remained "wide open" for several hours, though there was no car in the driveway. Purportedly concerned about the "unsecured nature of the home," agents contacted the Portland Police Department (PPD) to "conduct a welfare check."

Two PPD officers arrived at Royle's house around 10:30 p.m. Officers reported that they observed a mess through the open front door and that no one appeared to be home. After

knocking on the screen door without response, the officers entered the residence. After "[s]everal minutes" looking around the residence, the officers exited. PPD then proceeded to talk to a neighbor, inquiring about Royle, and explaining that "[s]omebody called in a welfare check" on Royle, "[be]cause the front door was wide open, unlocked."

After PPD exited Royle's house, SA Fife approached the PPD cruiser to ask about "what happened." PPD told him that "no one was present in the home but that there were no signs of forced entry or other suspicious activity beyond the open door." SA Fife asked if PPD "s[aw] things there [in the house] that would . . . not still be there if the place had been . . . robbed." PPD responded that they observed "a laptop and several televisions, leading them to believe that no one had been in the residence to steal or attempt to steal anything." The next day, SA Fife wrote up a report about the events of July 8. Royle eventually received a copy of this report nearly three years later, in June 2018, in connection with pre-indictment talks with the government. This pre-indictment disclosure was the first time Royle learned that the July 8 search had taken place.

On Monday July 13, 2015, SA Fife obtained a search warrant for Royle's home and executed it the next morning at approximately 7:40 a.m. At this time, Royle was the only adult home. His two children, who were "[q]uite a bit under ten years

- 5 -

old," were also present.  SA Fife asked Royle whether there was someone who could pick the children up; Royle said his ex-wife could help and provided her phone number to the agents to arrange for the pickup.

During their search, agents discovered and seized a MacBook computer in an upstairs room, and that computer was later found to contain images depicting child pornography.[1]  No other computers were seized during the search.[2]  At the time the laptop was discovered, it was powered on and on top of a desk.  Agents further determined that the laptop was in the process of running "a wipe function," which the agents were able to stop by powering down the computer.[3]  Forensic examiners later discovered that the

---

[1] Child pornography is essentially defined as "any visual depiction . . . of sexually explicit conduct" involving a minor, with some nuance not relevant here.  18 U.S.C. § 2256(8).  Royle does not dispute that the images recovered from this laptop fit the applicable statutory definition.

[2] Agents also seized Royle's phone, though the government did not seek to admit at trial any evidence obtained from the phone.  SA Fife testified at Royle's suppression hearing that there was also an older computer in the residence -- a laptop that was found on the main floor of the house.  As SA Fife testified, agents "ruled it out either because it was a work laptop or because it was . . . a very old laptop that had no remnants of anything on it that [they] were looking for."

[3] According to the testimony, a wipe function performs an intensive deletion process.  Typically, when a user deletes files, these items actually remain in a type of limbo known as "unallocated space," and are still recoverable with the help of forensic tools.  A wipe function permanently deletes these files, rendering them unrecoverable.

wipe function running on the MacBook had been initiated at around 6:55 a.m. that day.

In November 2018, Royle was charged with one count of knowingly possessing and accessing with intent to view child pornography, and attempt to do the same, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256(8)(A). In July 2019, Royle moved to dismiss the indictment, arguing that SA Fife's failure to disclose the existence and details of the July 8 search at any time before June 2018 violated his procedural and substantive due process rights. In the alternative, he moved to suppress the fruits of the July 13 warrant-backed search on the grounds that the evidence was derivative of observations made during the warrantless search on July 8. Following a hearing in October 2019, the district court denied Royle's motion to suppress, holding that the July 8 search was justified under the community caretaking exception to the warrant requirement or the good faith exception "vis-a-vis the wellness check." The court also ruled that, in any event, the evidence obtained from the July 14 search was admissible under the independent source doctrine. The district court further rejected Royle's arguments regarding the failure to give earlier notice of the July 8 search. The court explained that Royle's analogies to the pre-indictment delay and Speedy Trial Act contexts "don't . . . really work here, [and] certainly not in a way that would lead me to dismiss the case." The court explained, however,

that while it was denying Royle's motion, "if there are ways at trial that this failure to disclose has prejudiced [him] in a way that I can remedy at trial, I'm open to it."

Royle was convicted on January 23, 2020, following a three-day jury trial. The government's evidence consisted principally of testimony from special agents Fife, Douglas McDonnell, and Seth Plumb, as well as various exhibits reflecting images and data recovered from the MacBook. SA Fife testified as to the circumstances surrounding the warrant execution at Royle's home, as discussed above, and SA McDonnell testified about his role as a member of the team that executed the search warrant on July 14. As will be further detailed below, the forensic evidence -- introduced mainly through SA Plumb -- included images of minors engaged in sexually explicit conduct, internet browsing history, and other tranches of data demonstrating that the laptop recovered from Royle's home was used to access child pornography. The government argued to the jury that this data, along with other circumstantial evidence that will be discussed, proved that Royle knowingly possessed and accessed the child pornography found on the MacBook.

At the close of the government's evidence, Royle moved for an acquittal, arguing that the government failed to prove beyond a reasonable doubt that he knowingly used the laptop to access child pornography. The district court reserved judgment,

see Fed. R. Crim. P. 29(b), and ultimately denied Royle's renewed motion for acquittal in a written order following the verdict. This timely appeal followed.

## II.

### A.

Royle first challenges the district court's denial of his motion to suppress. The government argues that the July 8 search of Royle's home was justified pursuant to the emergency-aid exception to the warrant requirement and, in any event, that the fruits of the later warrant-backed search were admissible under the independent source doctrine. Because we agree with this second argument, we need not consider whether the July 8 search was justified under the emergency-aid exception. Accordingly, we assume the July 8 search was in violation of the Fourth Amendment for the purposes of our analysis, and nevertheless affirm the court's denial of Royle's motion.

As a general matter, "[a]s a prophylaxis against unreasonable searches," the exclusionary rule prohibits introducing the fruits of an unlawful search into evidence. United States v. Flores, 888 F.3d 537, 545 (1st Cir. 2018). Nonetheless, "under the independent-source doctrine, evidence acquired from a lawful source that is independent of any Fourth Amendment infraction is admissible," because "the exclusionary rule should not put agents 'in a worse position' than if the

[initial] constitutional infraction had not happened." <u>United States</u> v. <u>Ponzo</u>, 853 F.3d 558, 573 (1st Cir. 2017) (quoting <u>Nix</u> v. <u>Williams</u>, 467 U.S. 431, 443 (1984)). Thus, when information is obtained through an illegal search, then through a later, warrant-backed search, "the fruits of that [later] search [are] admissible . . . unless (1) 'the agents' decision to seek the warrant was prompted by what they had seen during' the initial illegal search or (2) 'information obtained during that [illegal search] was presented to the Magistrate and affected his decision to issue the warrant.'" <u>United States</u> v. <u>Soto</u>, 799 F.3d 68, 82 (1st Cir. 2015) (quoting <u>Murray</u> v. <u>United States</u>, 487 U.S. 533, 542 (1988)) (final alteration in original). Here, Royle argues only that the July 13 warrant was deficient under this first consideration, sometimes called the "subjective" prong. So we need not consider the second.[4]

Where, as assumed arguendo here, an unlawful search precedes the procurement of a warrant, our "subjective inquiry" asks "whether 'the agents' decision to seek the warrant was prompted by what they had seen during the initial [illegal]

---

[4] The warrant contained no information about the July 8 search or information that was obtained via the July 8 search. In any event, after reviewing the warrant application, we have "little doubt that the [non-July 8 related] information was sufficient to support the judge's decision to issue the warrant." <u>See</u> <u>United States</u> v. <u>Rose</u>, 802 F.3d 114, 124 n.4 (1st Cir. 2015) (explaining that this second inquiry is "wholly objective" (quoting <u>United States</u> v. <u>Dessesaure</u>, 429 F.3d 359, 369 (1st Cir. 2005))).

entry.'" United States v. Rose, 802 F.3d 114, 123-24 (1st Cir. 2015) (quoting United States v. Dessesaure, 429 F.3d 359, 369 (1st Cir. 2005)) (alteration original). This inquiry "turns on whether the particular officer would have still sought the warrant absent the unlawfully-obtained information." Id.; see also United States v. Siciliano, 578 F.3d 61, 77 (1st Cir. 2009) (explaining that the question is "whether the officers would have sought the warrant even if the unlawful evidence had not been available"). Although this is "a subjective test, . . . it should not be proven by purely subjective means." Dessesaure, 429 F.3d at 369. That means that "the district court is not bound by after-the-fact assurances of [the officers'] intent, but instead must assess the totality of the attendant circumstances to ascertain whether those assurances appear 'implausible.'" Id. (quoting Murray, 487 U.S. at 540 n.2). We review a district court's determination under the subjective prong -- which is a factual finding -- for clear error. Soto, 799 F.3d at 83.

We conclude that the district court did not clearly err in finding that SA Fife's decision to seek a warrant was not "prompted" by any information he learned from the July 8 search. This finding was amply supported by SA Fife's hearing testimony that what he learned on July 8 did "not at all" affect his intent to get a warrant for Royle's home. Although such "after-the-fact assurances" are not controlling, see Dessesaure, 429 F.3d at 369,

- 11 -

the district court was entitled to credit this testimony in examining evidence of SA Fife's preexisting intent, as it explicitly did.  United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015) ("[A] challenge based on a district court's credibility determination 'can virtually never be clear error.'" (quoting Anderson v. City of Bessemer, 470 U.S. 564, 575 (1985)).

Indeed, the plausibility of SA Fife's assurances is firmly supported by emails he exchanged with the prosecutor days and hours before the July 8 search occurred.  As previously mentioned, SA Fife had already drafted an affidavit to support a search warrant application and sent it to the prosecutor on July 6.  Other emails showed that, several hours before SA Fife returned to Royle's home to conduct surveillance on July 8, both he and the prosecutor agreed that the contents of that draft were sufficient for their purposes and planned to submit it for internal approval.  They further planned to seek and execute a warrant the following week.  As the emails show, that decision to wait was prompted by administrative issues.  There was no suggestion that either of them believed additional information was needed, and nothing presented at the hearing compelled any finding to the contrary.  We have repeatedly held that such evidence of a pre-existing intent to obtain a warrant is sufficient to support application of the independent source doctrine.  Dessesaure, 429 F.3d at 369 (officers not prompted to seek warrant when they were going to apply for one

prior to warrantless entry); Soto, 799 F.3d at 83 (independent source doctrine applied, in part, due to pre-existing investigation of the defendant); Flores, 888 F.3d at 546-49 (investigation prior to initial search reflected intent to obtain warrant); see, e.g., United States v. Combs, 727 F. App'x 744, 748 (3d Cir. 2018) (independent source doctrine satisfied when law enforcement "already in the process of preparing a search warrant" prior to pre-warrant welfare-related search of the home (internal quotations omitted)).

Nevertheless, Royle contends that, even assuming SA Fife intended to seek a warrant prior to the July 8 search, this intent was vitiated when he saw the unsecured house. In other words, his concern about a potential break-in at Royle's home -- and the prospect that evidence may be stolen -- extinguished his intent to follow through with the plan to seek a warrant the following week. Royle argues that those concerns were only abated -- and SA Fife's intent restored -- after the warrantless search confirmed that a laptop was in the home. But he offers nothing more than rank conjecture to support this theory, and it is belied by the hearing testimony. The district court credited SA Fife's assurance that the events of July 8 did "not at all" effect his decision to get a warrant, and this finding was not clearly wrong. Indeed, SA Fife also testified that he had no expectation that the police would enter the house to conduct the welfare check. He did not

provide them any direction before they did so, let alone request that they check that certain items were not missing. This testimony was further corroborated by that of the PPD officers who performed the search, who confirmed that the choice to enter the home was their own decision based on the circumstances.[5]

Royle further argues that the independent-source rule is inapplicable under these circumstances, because PPD officers could have discovered something during their search -- i.e., that items actually had been stolen from the house -- that could have diminished SA Fife's intent to execute the warrant. This is a nonstarter. As the Supreme Court explained in Murray, the independent source doctrine is not concerned with "whether some hypothetical illegal search would have aborted the warrant," as

---

[5] To the extent Royle contends that the independent source rule can only apply if the initial search "had no effect on [SA Fife's] decision to seek the warrant," he is incorrect. Our cases make clear that the doctrine's application turns on whether the warrant decision was "prompted by," not merely "influenced by," the illegal search. For instance, in Soto we explained that an agent's "candid acknowledgment that the [evidence from the initial illegal search] was a factor in his initial decision to seek the warrant[] does not" affect the independent-source analysis. Soto, 799 F.3d at 84. Indeed, "[t]he question is not whether the evidence [observed during the illegal search] did influence the officer's decision[,] . . . but whether the same decision would have been made if the evidence had not been known." Id. In any event, even if we were to endorse Royle's alternative test, SA Fife's plausible and credited testimony that the events of July 8 did "not at all" affect his decision to obtain a search warrant would result in the same outcome.

- 14 -

going that far would "expand our existing exclusionary rule." See 487 U.S. at 542 n.3.

Royle also contends that this case involves the concerns implicated in Murray -- the "so-called confirmatory search, conducted for the precise reason of making sure it is worth the effort to obtain a search warrant." United States v. Restrepo, 966 F.2d 964, 971-72 (5th Cir. 1992) (quoting LaFave, Search and Seizure, § 11.4(f), at 70 (1992 Supp.)) (internal quotations omitted). We disagree, for the reasons already discussed. As in Murray, this case is not an example of a "'search first, warrant later' mentality," as "there is nothing to suggest that [officers] went in merely to see if there was anything worth getting a warrant for." Murray, 487 U.S. at 540 n.2. As the record demonstrates, SA Fife had already determined that there was something in Royle's home "worth getting a warrant for," based on the link between Royle's IP address and child pornography. Indeed, he had already gone through the effort of drafting the search warrant affidavit and felt the contents were adequate for probable cause. Moreover, the district court credited SA Fife's claim that his call to PPD was for a wellness check, not a confirmatory search, and we see no clear error in that finding.

In sum, the record evidence supports the view that "[t]he facts gathered legally, without resort to the facts gathered illegally, provided an independent and adequate source for the

- 15 -

warrant application." Dessesaure, 429 F.3d at 370. The district court found that SA Fife would have still sought a warrant absent the July 8 search, and our review of the record does not leave us with "'a definite and firm conviction' that this was a mistake." Soto, 799 F.3d at 84 (quoting United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011)). We have affirmed application of the independent source doctrine on less robust showings. See Dessesaure, 429 F.3d at 369. Accordingly, we affirm the district court's denial of Royle's motion to suppress.

**B.**

Next, Royle challenges the district court's denial of his motion to dismiss the indictment or suppress the fruits of the July 13 warrant due to deficient notice. Specifically, he argues that the government's years-long delay in notifying him of the July 8 search was unreasonable in violation of the Fourth Amendment, and also violated his Fifth Amendment due process rights by preventing him from investigating the circumstances of the search while memories were fresh. Although Royle contends that these inquiries run together and that his Fourth Amendment claim is "rooted in" due process, his argument for dismissal or suppression on Fourth Amendment grounds is underdeveloped and

therefore waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).[6]

In seeking dismissal on due process grounds, Royle compares the government's failure to timely notify him of the July 8 search to cases of pre-indictment or pre-trial delay.  The

_____

[6] Royle advances this argument in a single sentence of his brief, contending that "[w]hile advance notice [of the search] is not required, once the search had been completed, [he] was entitled to 'constitutionally adequate' notice that it had happened."  Royle cites Dalia v. United States, 441 U.S. 238, 248 (1979), in support of this contention.  But that case, confronting a challenge to the constitutionality of Title III, stands for the proposition that there is no "constitutional rule proscribing all covert entries," despite the fact that "covert entries" inherently involve a "lack of notice."  Id. at 247-48.  Royle offers no authority to support his contention that timely notice of a warrantless search after it has occurred is constitutionally required under the Fourth Amendment.

Moreover, even if the July 8 search was unreasonable under the Fourth Amendment due to delayed notice, and that such a violation would be appropriately remedied by operation of the exclusionary rule, we do not see why the independent source exception to the exclusionary rule would not render the fruits of the July 13 warrant admissible.  As discussed above, the "independent source doctrine acts as a limitation on the exclusionary rule of the Fourth Amendment," Dessesaure, 429 F.3d at 365 n.6, by permitting "admission of evidence that has been discovered by means wholly independent of any constitutional violation."  Id. (quoting Nix, 467 U.S. at 443).  Thus, even if the delayed notice provided to Royle rendered the July 8 search unlawful, we would conclude that the independent source exception to the exclusionary rule applied, and that the district court was justified in denying Royle's motion to suppress.  See, e.g., United States v. Freitas, 800 F.2d 1451, 1456-57 (9th Cir. 1986) (finding a notice-based defect in the warrant, but explaining that suppression was improper because of operation of an exception to the exclusionary rule).

- 17 -

district court determined that Royle had failed to present sufficient authority for the proposition that the government had an obligation to disclose this information sooner than it did, or show that dismissal was warranted. We affirm the district court's conclusion that there was no constitutional violation here.

As he did before the district court, Royle argues that his due-process claim should be resolved "[i]n keeping with" the "principles" of pre-indictment delay and speedy trial cases. We think the speedy trial framework is unsuitable to assessing Royle's due process claim, as the guarantee of a speedy trial reflects a distinct right protected by the Sixth Amendment and the Speedy Trial Act, see United States v. Irizarry-Colón, 848 F.3d 61, 67 (1st Cir. 2017), while Royle has unequivocally explained that the delayed notice violated the Fifth Amendment.[7]

"[E]xcessive pre-indictment delay can sometimes, albeit rarely" violate due process, "if the defendant shows both that the 'delay caused substantial prejudice to [defendant's] right to a fair trial' and that 'the [g]overnment intentionally delayed indictment . . . to gain a tactical advantage.'" Irizarry-Colón, 848 F.3d at 70 (quoting United States v. Bater, 594 F.3d

---

[7] The speedy trial analogy is likewise inapposite, given that the "right attaches only . . . [after] a defendant is indicted, arrested, or otherwise officially accused," United States v. MacDonald, 456 U.S. 1, 6 (1982); United States v. Handa, 892 F.3d 95, 101 (1st Cir. 2018), but the delay Royle contests occurred pre-indictment.

51, 54 (1st Cir. 2010)) (emphasis original). The second prong requires showing "deliberate misconduct by the prosecutor (or at least something very close to that)." Bater, 594 F.3d at 54. We review the district court's decision not to dismiss an indictment for a purported pre-indictment delay due process violation for abuse of discretion. Irizarry-Colón, 848 F.3d at 70.

Even if we assume that the "principles" from the pre-indictment delay context govern Royle's claim, this is not one of the rare cases where we would conclude there was a due process violation. First, Royle cannot make out the requisite prejudice. "With respect to prejudice, a defendant must do more than allege that witnesses' memories had faded or that evidence had been lost that might have been helpful to him." Id. (quoting United States v. Muñoz-Franco, 487 F.3d 25, 58 (1st Cir. 2007)). Here, all that Royle alleges is that witnesses' memories have faded and that evidence that might have been helpful to him was lost. His argument fails accordingly.[8]

---

[8] Despite asking us to view his claim through the pre-indictment delay lens, at the same time Royle suggests that the applicable standard is an imperfect fit under these circumstances. In essence, he contends that prejudice under his circumstances should be assumed satisfied in his case, because the undisclosed information was uniquely and exclusively known to the government. With this undisclosed knowledge, he says, the government impeded his ability to begin investigating the circumstances of the July 8 search at an earlier time, which not only prejudiced him but also gave the government a leg up. But we fail to see how this meaningfully differs from the potential for prejudice in the pre-

Moreover, any argument that "fresher" memories from the witnesses would have helped Royle is speculative and based on "conjecture." Bater, 594 F.3d at 54. Indeed, if witnesses with fresher memories had testified "it is not clear just what [they] would have said or how much it would have helped [Royle]." Id. at 55; United States v. McCoy, 977 F.2d 706, 711 (1st Cir. 1992) ("For the defendant to carry the heavy burden of proving actual prejudice from pre-indictment delay, concrete proof is required; mere speculation and bare allegations will not suffice."). Royle effectively concedes this very point, noting that "[i]t is impossible to know what [the two] PPD witnesses [who testified at the suppression hearing] would have said about what Fife was up to on July 8" had Royle been notified of the search earlier. Despite having access to audio recordings obtained from body microphones worn by the officers during the search, Royle offers no evidence to suggest that any accounts from the PPD officers closer in time to the search would have meaningfully differed from what they offered at his suppression hearing.

---

indictment delay context. In either case, the government's delay in providing notice of information exclusively known to it -- whether it be the circumstances of a search or the fact of an impending grand jury indictment -- affects the defendant's ability to prepare a defense. United States v. Lovasco, 431 U.S. 783, 796 (1977) (acknowledging that "lapse of time" indicting may have had negative impact on defense); United States v. Ciampaglia, 628 F.2d 632, 639 (1st Cir. 1980) (noting that a delay in indictment delays notice to indictee).

- 20 -

If there was any doubt, Royle has also failed to show that "the [g]overnment intentionally delayed [disclosure] . . . to gain a tactical advantage." Irizarry-Colón, 848 F.3d at 70 (quoting Bater, 594 F.3d at 54). As in the pre-indictment context, this perhaps could have been shown by evidence that the government purposefully "[d]elay[ed] [disclosure] in order to deprive [him] of witnesses." Id. at 71. But, again, Royle's argument that this was the case rests on pure conjecture. Thus, "[e]ven if [Royle] had demonstrated some degree of prejudice from the delay," this appeal would fail, as he has "made no concomitant showing that the government intentionally delayed [disclosure] to gain tactical advantage." Muñoz-Franco, 487 F.3d at 59; Bater, 594 F.3d at 53-54 (no violation of due process after four-year pre-indictment delay, when there was "no evidence that the government delayed the indictment to deprive [defendant] of [relevant] testimony") (emphasis original).

We acknowledge that the government's delayed disclosure was inopportune. "Obviously it is undesirable that [notice] be delayed . . . ." Bater, 594 F.3d at 54. However, even assuming that we would apply the analysis used in pre-indictment delay cases, on these facts there is no showing that Royle was actually prejudiced by this late disclosure or that it was in bad faith.

- 21 -

Accordingly, the district court did not abuse its discretion in denying Royle's motion to dismiss.[9]

## III.

Finally, Royle challenges the sufficiency of the evidence to prove that he "knowingly possess[ed], or knowingly access[ed] with intent to view" child pornography found on the laptop, as required to sustain his conviction under 18 U.S.C. § 2252A(a)(5)(B). We disagree.

"We review preserved challenges to the sufficiency of the evidence de novo, viewing the record in the light most favorable to the prosecution and rejecting such challenges if any rational jury could have convicted the defendant when considering all the evidence, direct and circumstantial, in this way." United

_____

[9] We note that applying caselaw from the Brady context would also not help Royle. When the government has delayed disclosure of exculpatory evidence, we review for abuse of discretion, and affirm unless "the delayed disclosure prejudiced the defendant." United States v. Montoya, 844 F.3d 63, 71 (1st Cir. 2016). In this context, "the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986). "[A] court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted." United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990). For the same reasons his challenge fails in the pre-indictment delay context, he also would not succeed if we used the lens of the Brady cases: Royle has not shown prejudice from his delayed notice of the search.

States v. Levin, 13 F.4th 96, 99 (1st Cir. 2021). "[T]he issue is not whether a jury rationally could have acquitted but whether it rationally could have found guilt beyond a reasonable doubt." Id. at 99–100 (quoting United States v. Breton, 740 F.3d 1, 16 (1st Cir. 2014)) (quotation omitted). Because Royle moved for an acquittal at the close of the government's case and the district court reserved decision, we must "consider only the evidence presented in the government's case-in-chief to assess whether 'a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006) (quoting United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)); see Fed. R. Crim. P. 29(b). Accordingly, we turn to an examination of the evidence introduced by the government.

**A.**

As discussed above, the government's trial evidence consisted of testimony from SA Fife and DHS special agents Douglas McDonnell and Seth Plumb, as well as forensic evidence consisting of images and other data extracted from the laptop.

To carry its burden on the mens rea element presently at issue, the government argued that this circumstantial evidence established that Royle was the user responsible for the child-pornography-related contents of the laptop.

- 23 -

This forensic data fit into roughly six related categories. First, the government introduced 17 exhibits, showing images of child pornography recovered from the laptop's deleted files. Some of the images contained superimposed text (i.e., a text stamp) depicting the name of a child pornography website.

Second, the government introduced evidence of internet-browser screenshots recovered from the laptop's deleted files containing the images previously discussed. As SA Plumb explained, these screenshots depicted what would have been visible in the browser at the time the corresponding images were displayed. He further explained that certain browsers capture such screenshots automatically, in order to show recently viewed webpages when a new browser window is subsequently opened. Another explanation he offered for how such screenshots could end up on (or deleted from) a device is if they were affirmatively taken by a user.

Third, the government produced internet browsing history, in chart form, collecting certain browsing activity recovered from the laptop's Firefox web-browser application from 10 dates spanning the period from April 2, 2015 to July 13, 2015. As SA Plumb explained, the chart was generated using a forensic tool and listed the following information: various web addresses visited by the browser; the corresponding title or name of each address's webpage as displayed therein; the date and time each was

visited;[10] the number of times each was visited;[11] and whether or not the website was typed into the browser by a user.  The chart showed visits to video-chat and image-hosting websites that, in SA Plumb's investigative experience, were linked to child pornography, such as ImageTwist, Omegle, and mrvine.net.  Moreover, some of the web addresses themselves and titles of the webpages used terms associated with child pornography (or otherwise suggestive of sexually explicit content involving minors), such as "Jailbait Amateur Pictures" and "Teens-posing and sex."  This included a site displayed as "stickamgfs.com," which frequently appeared in the browser history.

The chart further reflected that many of the visits to these websites occurred at late evening hours, and sequentially, for periods of time ranging from 20 minutes to an hour.  Furthermore, SA Plumb identified that some of the web addresses visited by the laptop matched the superimposed text, or file names, reflected in the sexually explicit images recovered from the laptop.  For example, one image was superimposed with "4947-pul.avi.," which was embedded in an ImageTwist web address visited

---

[10] The chart indicated the time in Universal Coordinated Time (UTC), and Plumb explained to the jury that this is four or five hours ahead of the time in Portland, Maine.  Exactly how many hours ahead depends on the "time of year."

[11] This metric only reflects a hit for a user going "to that one page that one time" -- thus, this metric is "precise to [a specific] web address."

on May 7, 2015: "http:imagetwist.com/dbk60c5x4il7/4947-pul.avi.jpg.html."

Fourth, the government introduced another chart generated by SA Plumb's forensic tools, the "SessionStore Artifacts," that contained additional information about the laptop's use of the Firefox browser. As SA Plumb explained, the SessionStore Artifacts reflected "a record of the most recent use of that browser," listed in individual entries containing a "title" and web address, but no data as to the date or time the material was accessed. In some instances, the "title" reflected search terms used in various search engines, including Google and Bing. For example, searches discussed during SA Plumb's testimony reflected Bing searches for "Young Teens in Swimsuits Candid," "Junior High Schools Bikinis," and "Tween Teen Bikinis Candid." SA Plumb further identified entries showing visits to some of the child-pornography-linked sites discussed above, e.g., ImageTwist, mrvine.net, and other sexually explicit references to "[j]unior [h]igh [s]chool" and "9_or_10_year_old_girl[s]." As with the browsing history example, SA Plumb was able to match several SessionStore Artifacts entries with file names appearing on the child pornography images previously introduced.

Fifth, the government introduced a third chart summarizing "Launch Services Quarantine Events" (LSQ) data extracted from the laptop and examined by SA Plumb. As SA Plumb

explained, LSQ data records instances in which a MacBook's user attempts to open a file downloaded from the internet. When such an attempt is made, the computer automatically provides a "yes" or "no" prompt to the user before the file can be opened, and this event is recorded. He further pointed out several entries between 2012 to 2013 recording attempts to open files with sexually explicit references to minors.

Finally, Plumb testified regarding a fourth chart reflecting extracted "QuickLook Thumbnail Cache" data. He explained that the QuickLook feature enables a user to quickly view the contents of files held in a folder directory by selecting an individual file and hitting the space bar. The data reflected in the QuickLook chart show the filenames and pathways for files that are prepared to be launched from the QuickLook feature. SA Plumb then proceeded to discuss specific entries of this data extracted from the MacBook. As he discussed and the jury was shown, many of the file names in these entries reflected picture and video files with overt references to minors engaged in sex acts, previously discussed websites, e.g., Omegle, or terms such as "jailbait." These files were all in the "aMule Downloads" folder.

As SA Plumb explained, aMule is a peer-to-peer file sharing program, which allows a user to search for and download files from the machines of other users over the internet. A user

of a peer-to-peer program can locate files of interest by using search terms, and can then download any particular file by "clicking" on it. With aMule, any such downloaded files will populate in an aMule downloads folder on the user's computer, which is automatically created by the program. SA Plumb further explained that, to his knowledge, a file would have to be clicked on by a user in order to be downloaded and populate in such a folder. Further evidence captured in the laptop's browsing history showed searches suggesting that the aMule program had been downloaded to the laptop from the internet, in April 2015. Although the aMule program was not installed on the MacBook when it was seized, SA Plumb confirmed through additional forensic tools that it was installed and running on the laptop as of July 9, 2015.

**B.**

Royle does not contest that the government sufficiently proved that the laptop both contained child pornography and reflected visits to websites associated with child pornography. Instead, he contends that the government failed to prove that Royle downloaded those images or visited those websites. Boiled down, his argument is twofold. First, he argues that the evidence failed to prove that the child pornography's presence on the laptop was a result of knowing human activity, rather than automated computer activity. Second, he argues that even if the evidence sufficiently established that a person was responsible, no rational jury could

conclude that he was that person without impermissible "guesswork." For this second argument, Royle heavily relies on our decision in United States v. Pothier, 919 F.3d 143 (1st Cir. 2019). We address and reject each argument in turn.

### 1. Human Activity

Royle argues that various non-volitional "automatic process[es]" could have caused the pornographic material to end up on the computer. Specifically, he argues that processes such as "caching," "pre-fetching," "re-direction," or "malware" could explain the presence of illegal material on the laptop.[12] He points to SA Plumb's concession on cross-examination that he could not say for certain how the images recovered from the laptop got there and that it could have possibly been due to one of those automated processes. But a rational jury could have readily found this theory implausible, given the volume of evidence showing child pornography browsing and peer-to-peer downloads, and other evidence tending to show that a human accessed the recovered images.

---

[12] Both pre-fetching and caching are processes that allow computers to quickly respond to queries from users. As SA Plumb testified, pre-fetching refers to a process in which "files that [have] previously been accessed are . . . prioritized in a way to allow them to be in active memory quicker." Likewise, caching is an automatic process in which the browser saves items displayed on the screen "to a certain degree within the computer," so if a user returns "to that page or . . . want[s] to access that link it will be available to [him] more quickly."

First, a reasonable jury could have rejected the notion that child pornography inadvertently ended up on the computer through these automated processes in light of the considerable volume of that data in evidence. For instance, the browsing history, reflecting activity from 10 dates spanning April to July 2015, collectively showed hours of sequential visits to dozens, if not hundreds, of webpages associated with child pornography. Similarly, the SessionStore Artifacts chart contained over 1,400 individual entries for webpages recently visited by the laptop's browser, many of which very clearly reference child pornography. The volume of this activity helps dispel any reasonable doubt about whether the data resulted from mistake or the automated processes of innocent web browsing. Cf. United States v. Myers, 560 F. App'x 184, 187 (4th Cir. 2014) (holding that the "plethora of child pornography on [defendant's] computer . . . establish[ed] that it was not by mistake or error that the files were downloaded").

Second, multiple pieces of evidence showed that the laptop was affirmatively manipulated by a human, in at least some instances, in connection with child pornography viewing activity. For example, the browsing activity evidence, aided by SA Plumb's testimony, showed that visits to the sites omegle.com and stickamgfs.com were initiated by a person typing those addresses

into the browser window.[13] Omegle.com, which had three typed visits logged as of April 2015, was known to SA Plumb through prior child exploitation investigations and was superimposed on some of the images in the case. Similarly, typing-initiated visits to stickamgfs.com on separate days in May 2015 linked to pages with "Jailbait Videos" in the title. The SessionStore Artifacts evidence further supports an inference of human-initiated activity, where searches for illicit terms such as "Young Teens in Swimsuits Candid" appeared. Cf. Breton, 740 F.3d at 17 (noting that a "history of visits to websites with a child pornography connection or use of search terms associated with child pornography can support a finding that the defendant knew the images he retrieved contained child pornography"); United States v. Shiver, 305 F. App'x 640, 643 (11th Cir. 2008) (rejecting the theory that child pornography appeared "on [defendant's] computer without his knowledge by a virus or by 'pop-up' windows that appeared on his computer screen unbidden," when "the government's computer expert testified that Internet searches conducted on [the defendant's] computer used words and terms that were likely to return pornographic images of children"). Further evidence reflecting repeated viewing of specific pornographic videos also cuts against

---

[13] SA Plumb acknowledged that this search could appear "typed" if it had been copied and pasted. This, however, still evidences volitional activity.

- 31 -

a theory that malware or automatic "re-direction" was the real perpetrator. See Shiver, 305 F. App'x at 643 (repeated viewing of image supports theory of volitional activity).

Moreover, the contents of the aMule downloads folder provide further evidence that a human downloaded the child pornography found on the MacBook. SA Plumb testified that any downloads from aMule "would have had to have been clicked on and downloaded" to end up in that folder. And the content in the aMule downloads folder suggests a human used aMule to download child pornography, given that the titles in the folder explicitly referenced girls ranging from "6Yo" to "15Yo" engaging in sex acts. The government did not introduce any of the images or videos from the aMule files into evidence. However, as we have previously recognized, "[t]he presence of files with names indicative of child pornography -- even absent further proof of what, if anything, those files contained -- tends to make it more probable that [a defendant] knowingly was involved with child pornography." Breton, 740 F.3d at 14.[14]

---

[14] The aMule downloads folder and its files were not actually present on the laptop when recovered. However, the government sufficiently established that they were, at some time, through SA Plumb's explication of the function of the QuickLook Thumbnail cache. It further demonstrated that the aMule program was apparently removed from the laptop sometime between July 9, when it was known to be running, and the July 14 seizure, when it was no longer installed.

Moreover, the pornographic content on the computer was consistent across time and across various tranches of data (aMule, QuickLook, etc.), suggesting human -- not automated -- activity. The aMule file names reflect the same sources of content shown in the browsing history (e.g., Omegle and stickam) and use of similar terms (e.g., "jailbait").  The computer activity also reflected an absorption with certain subject matters: young girls of a specific age (10 to 15 years old), bikinis, and young girls from Russia.  A rational jury could conclude that a human with particular interests was behind these queries and downloads.

In sum, ample evidence supported the conclusion that a human being was responsible for the child-pornography-related evidence recovered from the laptop.

2. Evidence linking Royle to the Computer

There is also sufficient evidence to support the jury's finding that Royle, and not some other person, was behind the child pornography activity at issue.  While there is no direct evidence that Royle knew the images were on the laptop, "[w]e have recognized that knowledge of child pornography 'often is shown through circumstantial evidence.'"  Levin, 13 F.4th at 100 (quoting Breton, 740 F.3d at 17).  Here, a reasonable jury could infer that Royle knowingly possessed the child pornography from circumstantial evidence that he used the computer during the period that child pornography browsing activity occurred and that he was

- 33 -

the only plausible person who could have initiated the wipe function.

First, the evidence is sufficient to show that Royle was the only adult resident of the home where the computer was found. It was undisputed that Royle owned and resided at the home and that the home's internet service was registered in his name. The wifi network for the home was titled with Royle's initials. The government also established that Royle was observed at the home before the warrant was executed, and that only he and his two small children were there when agents arrived during the early morning hours of July 14. SA Fife further testified that, based on his walk-though of the home, it appeared that only one adult was living there. He also explained that Royle needed to call someone to pick up the children. Moreover, a reasonable jury could conclude that the room in which the laptop was found -- where it was open, and positioned on a desk -- was an adult's workspace, and therefore Royle's.[15] Thus, when a computer was seized from the home, and from this room, the jury could reasonably infer that it belonged to Royle, the home's only adult resident.

---

[15] Pictures of this room introduced by the government showed the MacBook on top of a desk, next to a printer. Other items visible on the desk were various papers, sticky notes, and a stack of books, including "The Goldfinch" by Donna Tartt and "On Immunity" by Eula Biss. A wooden baseball bat appeared beside the desk.

Various evidence from the computer itself further confirms that Royle used the laptop with some regularity. Indeed, Royle admitted to SA Fife that he used the laptop to access "Citrix client" for his work. Forensic evidence also showed that Royle had stored some personal documents on the computer. For example, filenames in the QuickLook Thumbnail Cache included "Royle Boys.jpg," "Royle, George 1400010680.pdf," "GEORGE.docx." The MacBook also contained tax-related documents, i.e., "2014TurboTaxReturn.pdf" and "GRFund 1099." A reasonable jury could further find additional filenames were linked to Royle, such as "Notes on SM Deposition.docx," given evidence that he was an attorney, and "CHILD SUPPORT AFFIDAVIT.pdf," given evidence that he was divorced and had young children.

There was also evidence of innocent browsing activity that the jury could have reasonably linked to Royle. For instance, evidence showed browsing activity associated with repair facilities in Portland, Maine, the local weather, Portland Sea Dogs tickets, baseball cards, questions about childcare, and activities to do with children. These queries all match up with what the jury knew about Royle -- he owned a home in Portland, had two young children, and had an interest in baseball.[16] From all

---

[16] The photo shown to the jury of the room that jurors could conclude was Royle's showed a baseball bat among his other belongings.

of this evidence, a reasonable jury could find that Royle used the laptop with some degree of regularity, which further supports a conclusion that he knew about the illicit images beyond a reasonable doubt.

All of this evidence supports a reasonable inference that Royle was the only adult living at the home while the laptop -- which he indisputably used -- accessed child pornography. A reasonable jury could have relied on this evidence in concluding that Royle was the only plausible user behind that activity. Indeed, the forensic evidence showed that the child-pornography-related browsing often occurred late at night and early in the morning. As we have recognized, evidence of child pornography access during times that only a person occupying a room or a home would be present tends to show that the primary occupant was responsible for such activity. See United States v. Figueroa-Lugo, 793 F.3d 179, 188-89 (1st Cir. 2015) (evidence that illicit files were downloaded at around 4:00 a.m. onto computer found in defendant's bedroom supported jury's rejection of other-user defense theory, where there was "no evidence that anyone else slept in the room or was present during the early morning hours"); see also United States v. Salva-Morales, 660 F.3d 72, 75 (1st Cir. 2011) (per curiam) (holding that it was reasonable to infer that owner of shop in which child-pornography-containing computer was found was behind access to illicit files accessed around 2:00 a.m.

and 9:00 a.m., given that he "locked up the shop at night . . . and presumably opened it as well in the morning").  This is a common-sense inference.  United States v. Williams, 717 F.3d 35, 40 (1st Cir. 2013) ("Jurors have the right -- indeed, the obligation -- to use their common sense in evaluating and drawing inferences from circumstantial evidence.").

Finally, the fact and timing of the wipe function initiated on the laptop was highly probative of Royle's knowledge of the child pornography files.  First, "evidence that a person deliberately deleted or attempted to delete files containing child pornography tends to show that the person was aware of the files and their illicit nature."  Breton, 740 F.3d at 13; United States v. Glassgow, 682 F.3d 1107, 1109-10 (8th Cir. 2012) (knowledge shown, in part, from deletion of images).[17]

The evidence reasonably supported a finding that Royle was the initiator of this wipe.  As discussed above, the government established that the wipe function began at 6:55 a.m., and that Royle was the only adult home at 7:40 a.m. when the agents discovered the open computer on a desk upstairs.  Although it is perhaps conceivable that an unknown, overnight or early-morning

---

[17] The facts in Royle's case provide especially compelling indicia of guilt, as the computer user here did not simply put files in the trash -- the pornographic content had already been deleted once, then a wipe function was initiated to further eviscerate the files.

guest initiated the wipe and left without trace prior to the agents' arrival, a reasonable jury could well find this theory implausible, based on the evidence previously discussed. In addition to evidence tending to show that Royle was the only adult living in the home and that he used the laptop, evidence showed that the wipe function would take approximately 13 hours to complete. Royle's argument that a transitory guest would have left the laptop unattended in Royle's home to complete this process defies common sense. See, e.g., United States v. Shaw, 670 F.3d 360, 366 (1st Cir. 2012) ("[J]urors are neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience" (quoting United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992))).[18]

### 3. Pothier: Other Plausible Users Theory

Lastly, to the extent Royle argues that our decision in Pothier is "materially identical" to his case and compels reversal,

---

[18] Royle argues that the wipe function was a perfectly innocent application to run. But, for the reasons discussed, a reasonable jury could supportably conclude that under these circumstances it evinced consciousness of guilt, rather than routine maintenance. United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) ("When assessing sufficiency challenges in criminal cases, we have remarked, time and again, that factfinders may draw reasonable inferences from the evidence based on shared perceptions and understandings of the habits, practices, and inclinations of human beings."). This is particularly so given the time-intensive nature of the process, the testimony that many files on the computer had already been deleted once, and that the wipe function, if completed, would have prevented forensic examiners from recovering the data.

he is mistaken. In Pothier, we reversed a child pornography conviction, holding that the evidence in that case was insufficient to support a finding that the defendant knowingly possessed child pornography. Pothier, 919 F.3d at 144, 148.

The defendant in that case, William Pothier, owned a laptop that was found to contain child pornography. The laptop was discovered by police in an Exeter, New Hampshire, apartment where two adults other than Pothier received mail. Id. at 146-47. One of these two other people -- Josephine Pritchard -- owned the apartment. Id. at 146. There was no additional evidence about the third adult. Id. Pothier also had a New York apartment where he would spend time, and owned other property in New Hampshire, where his car was registered. Id.

Police seized Pothier's laptop after initiating a search of the residence. When police arrived to execute the search, they repeatedly knocked on the door, and Pothier did not respond to the knocking for some time. Id. at 145. After entering the apartment, the police found the laptop in the living room of the residence. Id. at 144. The owner of the apartment, Pritchard, arrived during the search. Id. at 146.

Like the laptop here, Pothier's computer was not password protected. Id. at 145. Although Pothier admitted to owning the laptop and indisputably "used [it] on at least a handful of occasions," it was unknown "whether he left the laptop at the

[residence in question] when he was elsewhere." Id. at 146-47. At trial, the prosecution's "sole theory" was that "Pothier must have known that the illicit material was on his laptop because he was the only person who otherwise used [it], and therefore must have been the person who downloaded the pornography." Id. at 147.

In reversing Pothier's conviction on that theory, we explained that the government's evidence for the "knowing" element required "guesswork" between two "plausible" scenarios. Id. at 147. On the one hand, it was plausible that Pothier downloaded the child pornography but "decided to forgo password protection and then left the laptop in the living room of a residence at which two other people received mail." Id. On the other hand, it was also plausible that one of the two other adults "used the readily available laptop during Pothier's frequent absences to download the . . . child pornography." Id. Without more evidence to reasonably support a finding as to "which scenario describe[d] what happened," we held that the jury's acceptance of the former theory was necessarily based on "guesswork." Id. As we explained, "[g]uilt beyond a reasonable doubt cannot be premised on pure conjecture." Id. (quoting Stewart v. Coalter, 48 F.3d 610, 615 (1st Cir. 1995)) (alterations original). But "pure conjecture" is not what we have here.

Royle seems to suggest that Pothier created a bright-line rule that, where "someone other than the defendant had the

opportunity to use a [child-pornography-containing] computer," the government must affirmatively offer evidence "rul[ing] out" this other person or directly prove the defendant was using the computer when the illicit material was accessed. Here, Royle contends that other plausible "someone[s]" include the computer's automated processes, his ex-wife, the "unknown white female" observed outside of his house, or a burglar. He contends that Pothier requires reversal in this case because the government did not affirmatively "rule out" these other potential suspects. But Royle misreads things.

Our decision in Pothier created no such rule and expressly disclaimed any attempt to "make new law." Pothier, 919 F.3d at 149. The law remains that "[t]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000) (quoting United States v. Loder, 23 F.3d 586, 590 (1st Cir. 1994)); United States v. Naranjo-Rosario, 871 F.3d 86, 92-93 (1st Cir. 2017) ("[We need not] be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence." (quoting United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009))). Rather, the government need only prove each essential element of a charge beyond a reasonable doubt. United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010).

For the reasons already discussed, a reasonable jury could conclude that the government did so here.

Even if we assume, arguendo, that Royle's theories of other persons using the laptop to access child pornography are "plausible" on their face, the weight of the government's evidence here is markedly stronger than the "surprisingly incomplete record" in Pothier. See 919 F.3d at 147, 149. Unlike in Pothier, here, the government presented evidence that Royle was the only adult resident of the house, the laptop was found in a more private space than a living room, and the laptop was used to access child pornography during hours in which a resident of the house would presumably be home alone. The wipe-function evidence moves the needle to point even further away from a "plausible" coin-toss to Royle, and toward beyond a reasonable doubt, given the timing of when it was run.[19] Indeed, in Pothier, we noted that the absence of any similar attempt by the defendant to destroy the laptop's

_____

[19] We note that a rational jury would have been well-supported in rejecting alternative theories about the wipe as implausible or overly speculative. We refer to our discussion above as to Royle's argument that the laptop itself could have been the culprit. The notion that a person's ex-wife would briefly show up to his house at 6:00 a.m. to initiate a 13-hour wipe-function and then leave is implausible. Similarly, the notion that the "unknown white female" was behind the wipe, to the extent she was a different person, is too speculative to disrupt this verdict. The suggestion that a burglar, who periodically entered a dwelling over a period of months to download pornography, broke back into that home to delete evidence of his activity strains common sense. Although Royle does not specifically argue that any of these other potential users was behind the wipe function, his argument necessarily implies it.

child pornography -- despite perhaps having the time and means to do so -- undermined the sufficiency of the government's scant evidence. See Pothier, 919 F.3d at 147-48.[20] In sum, the combination of these factual distinctions removed the jury's task from the "guesswork" apparent in Pothier.

We conclude by noting that we agree with the district court's observation that "[t]he prosecution could have done more to investigate and demonstrate the laptop's provenance, usage, and location," and "other adults' access to the house." United States v. Royle, No. 2:18-cr-165-JNL, 2020 WL 2617133, at *9 (D. Me. May 22, 2020). However, this perspective alone does not allow us to disturb the jury's verdict. See, e.g., Salva-Morales, 660 F.3d at 75. Here, the government did enough. "Viewing the record as a whole and using their common sense," a rational jury could have found Royle guilty beyond a reasonable doubt. Williams, 717 F.3d at 40.

**IV.**

**AFFIRMED.**

---

[20] Pothier took about 15 minutes to answer the door to allow the police in; we noted that he did not run a wipe function or hide the computer during this "lengthy delay." Pothier, 919 F.3d at 147-48.

- 43 -